UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
In the Matter of the Complaint,

    of

                                        **MEMORANDUM AND ORDER**
                                      20-CV-04629 (OEM) (ARL)

ROBERT D. BROWN, as Owner of a 2020 42'
BLUEGAME (HIN: BGM420161920)
for Exoneration from or Limitation of Liability
-----------------------------------------------------------------x

ORELIA E. MERCHANT, United States District Judge:

        On September 29, 2020, petitioner Robert D. Brown ("Brown") commenced this action for

exoneration from or limitation of liability pursuant to the Limitation of Liability Act of 1851, 46

U.S.C. § 30501 *et seq.* (the "Limitation of Liability Act"), and Supplemental Rule F of the

Supplemental Rules for Certain Admiralty and Maritime Claims. *See generally* Complaint, Dkt.

1 (the "Complaint" or "Compl."). Before the Court is claimant Pat Malloy Waterfront LLC's

("Malloy") motion for judgment on the pleadings and for summary judgment. *See generally*

Malloy's Memorandum of Law in Support of Motion for Judgment on the Pleadings Pursuant to

Fed. R. Civ. P. 12(c) and Summary Judgment Pursuant to Fed. R. Civ. P. 56, Dkt. 104-2 (the

"Motion" or "Mot.").

        For the reasons stated below, Malloy's Motion is denied.

### BACKGROUND[1]

#### A. The Accident

        Petitioner Brown[2] is the owner of a 2020 42-foot-long Bluegame yacht (the "Vessel"). *See*

---

[1] The following facts are undisputed, unless otherwise indicated. Additionally, facts that were not contradicted by citations to admissible evidence are considered admitted. *See* FED. R. CIV. P. 56(e)(2); *Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted.").

[2] At the time of filing this suit, Brown was a resident of England. Compl. ¶ 3. He is now a resident of Florida. *See* Pat Malloy Waterfront LLC's Local Rule 56.1 Statement ¶ 1, Dkt. 104-32.

Pat Malloy Waterfront LLC's Local Rule 56.1 Statement ¶ 1, Dkt. 104-32 ("Malloy 56.1 Reply"); Declaration in Opposition of Robert D. Brown ¶ 2, Dkt. 104-31. The Vessel has an "advertised dry weight of 25,350 pounds" and is powered by "[t]wo Volvo diesel engines," which "each provid[e] 435 horsepower for 870 [horsepower] in total." Malloy 56.1 Reply ¶ 3.

Prior to September 20, 2020, Brown hired Billy Salazar ("Salazar"), a professional captain, to transport the Vessel from Fort Lauderdale, Florida, to Sag Harbor, New York. *Id.* ¶ 6. Brown additionally hired Salazar to operate the Vessel "on day trips/excursions, among other things." Compl. ¶ 6; *see* Plaintiff's Memorandum of Law in Opposition to Defendant Malloy's Motion for Summary Judgment at 2, Dkt. 104-18 (the "Opposition" or "Opp'n").

On September 20, 2020, Brown hired Salazar to take him and two guests on an excursion to the Peconic Bay. Opp'n at 2. That day, the Vessel was docked at Malloy's Slip 31, located in Sag Harbor, New York. Malloy 56.1 Reply ¶¶ 4, 22. Slip 31 was a floating dock, "equipped with three port side cleats, two port side pilings, two stern dock cleats, and a starboard side piling." *Id.* ¶¶ 23-24.

In preparation for the trip, Salazar "under[took] the task of untying the lines securing the Vessel in its dock slip," *id.* ¶ 31 (quoting Compl. ¶ 9), and began maneuvering the Vessel into the waterway, *see id.* ¶ 33; Opp'n at 2. Unfortunately, Salazar untied "all but one of the dock lines . . . leaving the port (left) side stern (back of boat) spring line attached" to a dock cleat. Opp'n at 2; *see* Mot. at 4. As Salazar drove the Vessel away, the line stretched and yanked the cleat out of the dock, "sling shott[ing]" it at Salazar's head. Opp'n at 3; *see* Malloy 56.1 Reply ¶¶ 35, 51. Salazar was knocked unconscious while at the helm of the Vessel. *See* Declaration of Christopher Trent-Keady, Exhibit B, Dkt. 104-5. Brown thereafter maneuvered the Vessel back to the slip, and passengers called 911. *See id.*; Robert Brown Deposition Transcript at 108:5-17, Dkt. 104-

29.  Salazar sustained and was ultimately treated for serious injuries, including, but not limited to, a left temporal skull fracture, subdural hematomas, and lacerations.  *See* Second Amended Answer to Complaint and Counterclaim of Claimants at 6, Dkt. 52 ("Salazar Second Amended Answer").

### B. Procedural History

Brown commenced this suit on September 29, 2020.  *See generally* Compl.  In his Complaint, Brown alleged that Salazar "negligently failed to untie" the remaining mooring line, *id.* ¶ 10, and asked the Court for five forms of relief: (1) to "[i]ssue an Order directing the issuance of a Notice to all persons claiming damages," *id.* at 4; (2) to "[i]ssue an Order restraining the further prosecution of any and all actions, suits, and legal proceedings to be commenced or already begun, if any, to recover damages" resulting from the September 20, 2020, accident (the "Accident"), *id.*; (3) to "[a]djudge and decree that [Brown] is not liable" for any claim arising out of the Accident, *id.*; (4) to limit Brown's liability to $750,000, the market value of the Vessel at the time of the Accident, should the Court determine Brown is liable for any claim arising out of the Accident, *id.* at 3-4; and (5) to order any additional relief that the Court deems just and proper, *id.* at 5.

On May 12, 2021, the Court entered an order directing issuance of a notice and enjoining any additional actions arising from the Accident.  *See* Order Approving *Ad Interim* Stipulation for Value, Directing Issuance of Notice and Enjoining Actions at 2, Dkt. 5.  The Court additionally "approved pending further appraisement as may be ordered by the Court" an *Ad Interim* Stipulation for Value filed by Brown in the sum of $750,000.00 with interest "as security for the amount or value of [Brown's] interest" in the Vessel.  *Id.* at 1-2.

Three sets of claimants subsequently came forward: (1) Salazar and his wife, Ingrid Salazar (collectively, the "Salazars"), *see generally* Salazar Second Amended Answer; (2) Costello's

3

Marine Contracting, Corp., and Costello Marine Services, Inc. (collectively, "Costello"), *see generally* Answer and Claim, Dkt. 13; Response to Counterclaim by Robert D. Brown, Dkt. 20; and (3) Malloy, *see generally* Answer and Claim, Dkt. 12 ("Malloy's Claim"); Malloy's Answer to Robert Brown's Amended Counterclaim, Dkt. 103 ("Malloy's Amended Answer"). Brown settled with the Salazars on or around September 19, 2023, *see* Minute Entry, Dkt. 75, and with Costello on March 12, 2025, *see* Stipulation of Partial Dismissal, Dkt. 101. Consequently, only Malloy's Claim and Brown's corresponding counterclaims remain. *See generally* Answer to Claim of Pat Malloy Waterfront LLC d/b/a Waterfront Marina with Amended Counterclaims, Dkt. 22 ("Brown's Amended Counterclaims"); Malloy's Amended Answer.

Malloy asserts that "[i]f any verdict or judgment is recovered against [it] in this action or any other action concerning the [Accident] for any alleged injury and/or damages, then, such injuries and/or damages were not the result of any negligent act by [Malloy], but were caused in whole or in part, by negligence, breaches, and/or culpable conduct of [Brown]." Malloy's Claim at 3. Malloy thus "demands judgment that the Complaint be dismissed with costs and disbursements" and that any damages recovered against it be indemnified by Brown "for the full amount of said liability or for such proportionate share as represents the amount, degree, or kind of culpable conduct attributable to [Brown]." *Id.* at 4.

Brown denies Malloy's allegations and argues that if "[Brown] has any liability to any claimants . . . it is by reason of the fault, negligence or lack of due care on the part of [Malloy]." Brown's Amended Counterclaims at 1. Brown urges that, should the Court find him liable, Malloy "should be required to contribute and indemnify [him] for any and all [damages and costs]." *Id.* Brown additionally states that "[b]ecause . . . Salazar has claimed seaman status [under the Jones Act], [Brown] has and/or will incur expenses related to a maritime obligation to provide

maintenance and cure to him without any fault" on his part and asserts that he is "entitled to recover all [such] sums from [Malloy]." *Id.* at 2. In other words, in addition to asking the Court to exonerate him from liability or, alternatively, to limit his liability, Brown asks the Court to award him damages for his counterclaims against Malloy. *Id.* In turn, Malloy denies Brown's counterclaims. *See generally* Malloy's Amended Answer.

Discovery closed on September 30, 2024, and on November 21, 2024, Malloy filed a premotion conference request on an anticipated motion for summary judgment. *See* Letter from Malloy to the Court (Nov. 21, 2024), Dkt. 88. Brown responded to Malloy's premotion conference request on December 13, 2024, *see* Letter from Brown to the Court (Dec. 13, 2024), Dkt. 94, and Malloy filed a reply in further support of its request on February 10, 2025, *see* Letter from Malloy to the Court (Feb. 10, 2025), Dkt. 100.

On February 11, 2025, the Court denied Malloy's request for a premotion conference, opting to set a briefing schedule instead. Consistent with that briefing schedule, Malloy served its moving papers on March 13, 2025, *see* Mot.; Brown served his opposition on April 14, 2025, *see* Opp'n; and Malloy served its reply and filed the fully briefed Motion on the docket on April 28, 2025, *see* Malloy's Reply Memorandum of Law in Further Support of Motion for Judgment on the Pleadings Pursuant to Fed. R. Civ. P. 12(c) and Summary Judgment Pursuant to Fed. R. Civ. P. 56, Dkt. 104-33 (the "Reply").

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a),[3] the Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled

---

[3] Federal Rule of Civil Procedure 12(d) ("Rule 12(d)") vests courts with the discretion to decide whether to convert a Federal Rule of Civil Procedure 12(c) ("Rule 12(c)") motion for judgment on the pleadings into a Federal Rule of Civil Procedure 56 ("Rule 56") motion for summary judgment. *Kristoffersson v. Port Jefferson Free Union Sch. Dist.*, 23-7232-cv, 2024 WL 3385137, at *2-3 (2d Cir. July 12, 2024). Rule 12(d) provides: "If, on a motion under Rule

to judgment as a matter of law."  The moving party first bears the burden of demonstrating that no

genuine issue as to any material fact exists.  *Gallo v. Prudential Residential Servs., Ltd.*, 22 F.3d

1219, 1223 (2d Cir. 1994).  The moving party must do so by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

FED. R. CIV. P. 56(c)(1).  Alternatively, the moving party may meet their initial burden by

demonstrating that "the nonmoving party has failed to make a sufficient showing on an essential

element of her case with respect to which she has the burden of proof."  *Celotex Corp. v. Catrett*,

477 U.S. 317, 323 (1986).

Once the moving party has met its burden, the nonmoving party must then "do more than

simply show that there is some metaphysical doubt as to the material facts . . . [T]he nonmoving

party must come forward with 'specific facts showing that there is a *genuine issue for trial*.'"

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (citations

omitted).  It may not "merely . . . assert a conclusion without supplying supporting arguments or

---

12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56.  All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."  Because the Court has relied on exhibits submitted by the parties in conjunction with this motion, the Court analyzes Malloy's motion for judgment on the pleadings and for summary judgment as solely a motion for summary judgment.  *See, e.g.*, *Perlman v. Fidelity Brokerage Servs. LLC*, 932 F. Supp. 2d 397, 406 n.6 (E.D.N.Y. 2013) (treating a motion for judgment on the pleadings and for summary judgment as only a motion for summary judgment where the court similarly relied on materials beyond the pleadings); *Ali v. Szabo*, 81 F. Supp. 2d 447, 450 n.1 (S.D.N.Y. 2000) (same).  The Court further determines that because Malloy initially requested a premotion conference on a summary judgment motion, which involved a round of briefing, and then subsequently framed its motion as both a Rule 12(c) motion for judgment on the pleadings and a Rule 56 motion for summary judgment, which also involved a round of briefing, the parties have had ample opportunity to present all pertinent material.

facts." *BellSouth Telecomms., Inc. v. W.R. Grace & Co.-Conn.*, 77 F.3d 603, 615 (2d Cir.1996) (quoting *SEC v. Rsch. Automation Corp.*, 585 F.2d 31, 33 (2d Cir. 1978)).

At this stage in the litigation, the Court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 122 (2d Cir. 2004). The "trial court's task . . . is carefully limited to whether there are genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue resolution." *Gallo*, 22 F.3d at 1224. In doing so, the Court must consider "only admissible evidence." *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997) ("[I]t is appropriate for district courts to decide questions regarding the admissibility of evidence on summary judgment.").

## DISCUSSION

### A. The Court's Admiralty Jurisdiction Applies.

Before turning to the merits of Malloy's Motion, the Court must determine what law governs this dispute. Brown brought this action asserting federal admiralty jurisdiction. Compl. at 1. He claims that this Court's admiralty jurisdiction applies because the Accident occurred on navigable waters and had the potential to affect maritime commerce. Opp'n at 10-14. Malloy, by contrast, contends that "this Court's subject matter jurisdiction is properly within the Court's diversity jurisdiction" because "Malloy's alleged negligence, as intimated by Brown's counsel through discovery, is alleged to have occurred on a floating dock, which is, as a matter of law, the land," and "Salazar's injuries could not, nor did they, have a disruptive effect on maritime commerce." Mot. at 10-14.

The Court concludes that it sits in admiralty jurisdiction. The Supreme Court has established a two-part test to determine whether federal admiralty jurisdiction applies to a tort

claim. *See Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 533-34 (1995).

> First, we ask whether the alleged tort meets the *location test*: that is, whether it occurred on navigable water or was caused by a vessel on navigable water. Second, we ask whether the alleged tort meets both subparts of the *connection test*: that is, whether the general type of incident involved has a potentially disruptive effect on maritime commerce, and whether the general character of the activity giving rise to the incident bears a substantial relationship to traditional maritime activity.

*Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 248 (2d Cir. 2014) (emphasis added) (citing *Grubart*, 513 U.S. at 534). Only if both parts of this test are met will admiralty jurisdiction lie. *Id.*

### 1. The Alleged Tort Meets the Location Test.

First, the alleged tort meets the location test because the effect of the tort took place on navigable waters. Under the location test, "the tort 'occurs' where the alleged negligence took effect." *Exec. Jet Aviation, Inc. v. City of Cleveland*, 409 U.S. 249, 266 (1972) (first citing *The Plymouth*, 70 U.S. 20, 36 (1865), *superseded by statute*, the Extension of Admiralty Jurisdiction Act, Pub. L. No. 695, 62 Stat. 496 (1948), *as recognized in Grubart*, 513 U.S. at 532; then citing *T. Smith & Son v. Taylor*, 276 U.S. 179, 182 (1928)); *see also Kelly v. United States*, 531 F.2d 1144, 1146 (2d Cir. 1976) (acknowledging the "traditional rule," which maintains that "where the negligent act originates on land and the damage occurs on water, the cause of action is within admiralty jurisdiction" (quoting *In re Motor Ship Pac. Carrier*, 489 F.2d 152, 157 (5th Cir. 1974))). Here, both parties acknowledge that Salazar was struck by the cleat while on the Vessel in the water. *See* Mot. at 12; Opp'n at 12. The proper location of his injury is therefore the water, not the land. *See, e.g.*, *T. Smith & Son*, 276 U.S. at 182 (holding that an injury took place on land where a longshoreman was struck by a sling carrying five 200-pound sacks on a wharf, the force of which knocked him off the wharf and into the Mississippi River, where he drowned); *Burke v.*

*Quick Lift, Inc.*, 464 F. Supp. 2d 150, 155 (E.D.N.Y. 2006) (holding that "the tort 'occurred' on navigable waters because the negligence 'took effect' while the [plaintiffs'] vessel was docked at a port on navigable waters, even though the negligent act itself—the installation of the davit [(a device that lifts a dinghy from the water onto a boat)]—took place elsewhere").

Further, the water where Salazar was injured is navigable. A waterway is "navigable for jurisdictional purposes if it is presently used, or is presently capable of being used, as an interstate highway for commercial trade or travel in the customary modes of travel on water." *LeBlanc v. Cleveland*, 198 F.3d 353, 359 (2d Cir. 1999). Courts have held that marinas constitute navigable waterways. *See, e.g.*, *Sisson v. Ruby*, 497 U.S. 358, 362 (1990) (analyzing a fire that broke out on a noncommercial vessel docked at a marina on Lake Michigan as having taken place on navigable waters); *Burke*, 464 F. Supp. 2d at 155 (similarly determining that an injury inflicted on a boat docked at a port in the Bahamas qualified as navigable waters). Here, Malloy operates a marina in Sag Harbor, New York. Malloy 56.1 Reply §§ 4, 54. This marina opens onto Gardiners Bay, which, in turn, feeds into the Long Island Sound. *Id.* § 54. The Court determines that these waters are capable of supporting commercial activity, such that they are navigable. *See Tandon*, 752 F.3d at 248 (deeming waters in Bridgeport, Connecticut, which similarly open onto the Long Island Sound, to be navigable).

The Supreme Court has expressly analyzed the effect of the alleged tort when determining where the tort took place. *Exec. Jet*, 409 U.S. at 255. *See generally* 1 THOMAS J. SCHOENBAUM, ADMIRALTY & MARITIME LAW § 3:5 (6th ed. 2024). Malloy's insinuation that this case law is somehow "outdated and non-binding," Reply at 6, lacks support. The effect of an alleged tort and whether the alleged tort took place on navigable waters are one and the same inquiry.

Moreover, Malloy acknowledges that the Second Circuit in *Tandon* did not actually reach a decision on the merits of the location test because it determined that the connection test was not met. *See* Mot. at 11; *Tandon*, 752 F.3d at 248-49 ("Like the Supreme Court in *Executive Jet,* we see no reason to resolve the difficult question of where the underlying tort (or torts) here occurred. . . . [A]dmiralty jurisdiction cannot attach because the connection test is not met."). Nevertheless, Malloy asserts that the Accident took place on a floating dock, which under *Tandon* constitutes land. Mot. at 11-12. However, the location in *Tandon* is arguably distinguishable from the location here. As in *T. Smith & Son*, where the effect of the tort at issue was first felt on a wharf before the injured longshoreman tumbled into navigable water, *see T. Smith & Son*, 276 U.S. at 182, the effect of the fistfight in *Tandon* first happened on a floating dock before the individuals involved fell into navigable water, *see Tandon*, 752 F.3d at 248. Here, by contrast, the effect of the injury was first felt by Salazar while on the Vessel in navigable waters.

## 2. The Alleged Tort Meets the Connection Test.

Second, the alleged tort meets the connection test because the Accident is of a general type that carries a potentially disruptive effect on maritime commerce and the activity giving rise to the Accident bears a substantial relationship to traditional maritime activity.

### a. The Accident Has a Potentially Disruptive Effect on Maritime Commerce.

When beginning the connection analysis, courts start by describing the "general features" of the alleged tort at an "intermediate level of possible generality." *Grubart*, 513 U.S. at 538-39 (quoting *Sisson*, 497 U.S. at 363). That description "focuses on the direct and immediate cause of the injuries suffered, rather than the alleged negligence underlying the suit. It also takes into account the general location of the incident and the roles of the persons involved." *Tandon*, 752 F.3d at 249 (citations omitted). Courts then consider whether the type of incident involved is

"likely to disrupt [maritime] commercial activity" by looking "not to the particular facts before [it] . . . but to whether similar occurrences are likely to be disruptive." *Id.* (first alteration in original).

Here, the Accident is best described as an injury to a captain operating a vessel in navigable waters. The Accident is the general type of incident that poses a threat to maritime commerce because, first and foremost, it involved a captain, an individual actually "engaged in maritime employment." *Id.* at 250. Further, that captain was injured while operating a vessel, which poses a real risk of an "obstruction to the free passage of commercial ships along navigable waterways" and can "lead to a disruption in the course of the waterway itself." *Id.* at 249. Injury to a captain while operating a vessel in navigable waters can also "endanger[] the safety of the vessel and risk[] collision with others on the same waterway." *Id.* at 250. The video Malloy submitted in support of its Motion makes this risk especially clear: in the video, the Vessel can be seen obstructing the waterway shortly after Salazar was knocked unconscious at the helm. *See* Declaration of Christopher Trent-Keady, Exhibit B, Dkt. 104-5.

Malloy's description of the alleged tort—as an "injury aboard a recreational vessel that was attempting to depart while still tied to the dock of a recreational marina," Mot. at 13—is "unnecessarily specific," *In re Petition of Germain*, 824 F.3d 258, 271 (2d Cir. 2016). The Supreme Court has emphasized the need to focus on "general features" of the alleged tort, such that the description is "neither too general to distinguish different cases nor too specific to the unique facts of the particular case." *Tandon*, 752 F.3d at 247 (citing *Grubart*, 513 U.S. at 538-39). It has "consistently stated that it does not matter for purposes of admiralty tort jurisdiction whether the vessel involved was used for commercial or recreational purposes." *Germain*, 824 F.3d at 271; *see id.* at 273 ("In *Foremost*, for example, the Court 'supported [its] finding of

potential disruption . . . with a description of the likely effects of a collision at the mouth of the St. Lawrence Seaway, an area heavily traveled by commercial vessels, even though the place where the collision actually had occurred apparently was "seldom, if ever, used for commercial traffic."'" (quoting *Sisson*, 497 U.S. at 363)).

As with the location analysis, Malloy makes much of *Tandon*, *see* Mot. at 12-14; Reply at 6, but, as Brown correctly notes, *see* Opp'n at 14, *Tandon* is distinguishable in the connection analysis as well.  In *Tandon*, the Second Circuit found that a "physical altercation among recreational visitors on and around a permanent dock surrounded by navigable water" presented "only a fanciful risk to commercial shipping." *Tandon*, 752 F.3d at 250-51.  As noted above, however, the Accident is of a class of incidents involving the injury of someone "engaged in maritime employment," which could "create an[] obstruction to the free passage of commercial ships along navigable waterways" or "lead to a disruption in the course of the waterway itself." *Id.* at 249-50.  *Compare, e.g.*, *id.* at 249-50 (finding no threat to maritime commerce in a case involving a "fistfight" between "recreational visitors on and around a permanent dock")*, with Ocello v. City of New York*, 05–CV–3725 (SLT)(JO), 2012 WL 4511262, at *5 (E.D.N.Y. Sept. 28, 2012) (finding a potentially disruptive effect on maritime commerce where a port mate was injured on a docking ferry).  The risk here is not "fanciful." *Tandon*, 752 F.3d at 251.

The other case upon which Malloy relies, *Susana v. New York Waterway*, 662 F. Supp. 3d 477 (S.D.N.Y. 2023), *see* Mot. at 13-14, is distinguishable for similar reasons.  There, the court applied *Tandon* and determined that "a passenger who trips and falls while disembarking a docked vessel" did "not realistically threaten maritime commerce." *Susana*, 662 F. Supp. 3d at 488.  Like *Tandon*, however, *Susana* did not involve someone "engaged in maritime employment." *Id.* (quoting *Tandon*, 752 F.3d at 250).  Nor did it "endanger the safety of the vessel" or risk any

12

"obstruction" or "collision" along navigable waterways because the passenger tripped and fell while exiting a docked boat. *Id.* (quoting *Tandon*, 752 F.3d at 249-50). Here, by contrast, a captain was injured while operating a vessel on navigable waters.

The Court thus finds that the Accident is of a general type that has a potentially disruptive effect on maritime commerce.

### b. The Activity Giving Rise to the Accident Bears a Substantial Relationship to Traditional Maritime Activity.

The Court additionally holds that the Accident satisfies the second prong of the connection test. As with the first prong, courts analyzing the second prong begin with a description. *Germain*, 824 F.3d at 274 (quoting *Ficarra v. Germain*, 91 F. Supp. 3d 309, 315 (N.D.N.Y. 2015), *rev'd sub nom. In re Petition of Germain*, 824 F.3d 258)). Here, too, courts consider the "general conduct from which the incident arose" and not "the particular circumstances of the incident." *Sisson*, 497 U.S. at 364. In *Sisson*, the Supreme Court defined the relevant activity giving rise to a fire on a noncommercial vessel docked at a marina on Lake Michigan as "the storage and maintenance of a vessel at a marina on navigable waters." *Id.* at 365. It noted that "[d]ocking a vessel at a marina on a navigable waterway is a common, if not indispensable, maritime activity" and that "most maritime voyages begin and end" there. *Id.* at 367. Here, as well, the activity giving rise to the Accident may properly be understood as "the storage and maintenance of a vessel at a marina": when Salazar was injured, he had just pulled the Vessel out of its slip and was in the process of navigating it out of the marina. *See, e.g.*, *Barber v. Marina Sailing, Inc.*, 42 Cal. Rptr. 2d 697, 703-04 (Cal. Ct. App. 1995) (concluding the second part of the connection test was met where a crew member's finger was severed in dock lines when the skipper engaged the ship's engine while departing the dock). Malloy notably does not put forward any arguments opposing the second prong of the connection test. *See generally* Mot.; Reply.

13

Accordingly, the Court concludes that it sits in admiralty jurisdiction and that maritime law governs this dispute.

**B. Genuine Issues of Material Fact Preclude Summary Judgment.**

Turning to the merits of the dispute, Malloy moves for summary judgment on Brown's counterclaims. *See generally* Mot.; Reply. As described above, both parties allege the other has been negligent and seek indemnification. *See* Malloy's Claim at 3-4; Brown's Amended Counterclaims at 1-2. In a limitation-of-liability case, the "elements to establish a claim of negligence under maritime law are the same as the elements of negligence under common law," in other words: duty, breach, causation, and damages. *In re Re*, 07-CV-223 (JFB)(MLO), 2008 WL 4069747, at *3 (E.D.N.Y. Aug. 27, 2008) (first citing *Petition of Kinsman Transit Co.*, 338 F.2d 708, 721 (2d Cir. 1964); then citing *Chylinski v. Wal-Mart Stores, Inc.,*150 F.3d 214, 218 (2d Cir. 1998)); *see also Jurgens v. Poling Transp. Corp.*, 113 F. Supp. 2d 388, 396-97 (E.D.N.Y. 2000) ("Federal maritime law incorporates common-law negligence principles, and New York law in particular." (citing *Int'l Ore & Fertilizer Corp. v. SGS Control Servs., Inc.*, 38 F.3d 1279, 1284 (2d Cir. 1994))). The burden of proof lies with the party asserting negligence. *United States v. Mowbray's Floating Equip. Exch., Inc.*, 601 F.2d 645, 646 (2d Cir. 1979).

"While a claim of negligence does not preclude the granting of summary judgement, courts are generally reluctant to grant summary judgment in negligence cases because the assessment of reasonableness is generally a question of fact 'in all but the most extreme situations.'" *Re*, 2008 WL 4069747, at *5 (quoting *Palmieri v. Celebrity Cruise Lines, Inc.*, 98 Civ.2037LAPHBP, 1999 WL 494119, at *3 (S.D.N.Y. July 13, 1999)); *King v. Crossland Sav. Bank*, 111 F.3d 251, 259 (2d Cir. 1997) ("[S]ummary judgment is highly unusual in a negligence action where the assessment of reasonableness generally is a factual question to be addressed by the jury."). Nevertheless,

14

summary judgment may be appropriate where the "non-moving party has failed to set forth any facts that go to an essential element of the claim." *King*, 111 F.3d at 259.

At a high level, Malloy argues that summary judgment is warranted because "Brown has failed to allege how Malloy[] was allegedly negligent." Mot. at 20. Malloy specifically challenges Brown's showing of breach and causation and argues that Brown has failed to put forward evidence of either element. *See id.* at 20-25. In opposition, Brown contends that "numerous material factual disputes . . . require denying summary judgment." Opp'n at 15. The Court addresses each element in turn.

**1.  There Are Genuine Issues of Material Fact as to Breach.**

Although not obliged to "guarantee the safety of vessels coming to [its] wharves," a wharfinger such as Malloy must "exercise reasonable diligence in ascertaining the condition of the berths threat, and if there is any dangerous obstruction to remove it, or to give due notice of its existence to vessels about to use the berths." *Mowbray's Floating Equip.*, 601 F.2d at 646 (quoting *Smith v. Burnett*, 173 U.S. 430, 433 (1899)).

In its Motion, Malloy argues that "it is undisputed that [it] was reasonably diligent to ensure that its dock cleats were safe and secure." Mot. at 22. Malloy contends that "[e]ach year in the spring, prior to the beginning of boating season," Malloy 56.1 Reply ¶ 10, it "routinely tested all of its dock cleats by putting a pull line on them to ensure that they were securely fastened to the dock," Mot. at 22. It further claims that "[e]ach day during boating season, either Malloy's dockmaster or one of the dockhands would walk around all of the docks . . . for the purpose of identifying any potentially hazardous conditions." Malloy 56.1 Reply ¶ 14. Malloy asserts that a "lag-bolted dock cleat is a common fixture at recreational marinas such as Malloy's," *id.* ¶ 15, and that there are no disputes "that its lag-bolts had an excellent mechanical grip on the finger dock

frame and planking" or that "the dock timbers were in good condition," Mot. at 22. "Given that there is no evidence that the lag-bolted dock cleat constituted a dangerous condition," Malloy argues, "it logically follows that Malloy[] could not have had notice about a dangerous condition that never existed," but "even assuming *arguendo* that Brown might argue that the lag-bolted cleat was undersized, then this condition would have been open and obvious to Capt. Salazar." *Id.*

In opposition, Brown principally relies on the deposition testimony and reports of two experts, Adon Austin and Captain Richard Bates. *See* Opp'n at 16-20 (citing, among other evidence, the Expert Disclosure of Opinion of Adon Austin, P.E., Dkt. 104-20 ("Austin Report"); the Deposition Testimony of Adon Austin, Dkt. 104-21 ("Austin Deposition"); and the Expert Disclosure of Captain Richard C. Bates, Dkt. 104-22 ("Bates Report")). Brown also relies, to a lesser extent, on testimony from former Defendant Costello. *See* Opp'n at 18. Brown argues that this evidence suggests that the cleat was a dangerous condition that Malloy did not exercise reasonable diligence to remove. *Id.* at 16-20. Brown contends that the cleat was "insufficient in size" (six, rather than twelve, inches long) and improperly installed (lag, rather than through, bolted), such that a "reasonably diligent inspection would have revealed the cleat's differing appearance, recognized the potential risk to vessels and their owners, and verified whether this smaller cleat was properly and securely bolted." *Id.* at 17-19. Brown adds that "a human being merely 'pulling a line' on the cleats is not a reasonably sufficient test to see whether a cleat is properly connected to the dock to withstand the foreseeable forces a vessel could put on them when docking or undocking." *Id.* at 17; Malloy 56.1 Reply ¶ 10; *see also* Austin Report at 16-17 (arguing that a licensed professional engineer should have designed and inspected the slip). Additionally, Brown contends that "[i]t is a known risk when designing and installing cleats on a dock that vessel operators occasionally forget or miss a dock line when departing a marina slip"

16

and that "[f]or this reason, it is standard practice to design the bolts fastening the cleat to the dock to resist an applied force greater than the ultimate failure load of the cleat." Opp'n at 18 (quoting Austin Report at 30). Brown claims that Salazar would have had a "reasonable expectation" that the cleat would not fail as it is "common practice for mariners to rely on a secure cleat when docking or undocking, not only when a dock line is forgotten" but also "when 'pivoting' in a cross-wind" to enter and exit a slip. Bates Report at 14.

Reviewing the evidence in the light most favorable to Brown, as the non-moving party, the Court finds that triable issues of fact exist as to whether Malloy breached its duty of care. Under Federal Rule of Evidence 702 ("Rule 702"), an expert witness may testify if:

> the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Although the "proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied . . . the district court is the ultimate gatekeeper." *United States v. Jones*, 965 F.3d 149, 161 (2d Cir. 2020). When considering whether to admit expert evidence, the Court must determine that (1) the witness is qualified to be an expert; (2) the opinion is based upon reliable data and methodology; and (3) the expert's testimony will assist the factfinder. *Nimely v. City of New York*, 414 F.3d 381, 396-97 (2d Cir. 2005). The Court may also consider the factors identified by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 593-94 (1993), although those factors "do *not* constitute a 'definitive checklist or test'" and "do not all necessarily apply even in every instance in which the reliability of scientific testimony is challenged." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150-51 (1999) (quoting *Daubert*, 509 U.S. at 593). The Court is

afforded "the same broad latitude when it decides how to determine reliability as it enjoys [with] respect to its ultimate reliability determination." *Cargo Logistics Int'l, LLC v. Overseas Moving Specialists, Inc.*, 723 F. Supp. 3d 212, 222 (E.D.N.Y. 2024) (quoting *Kumho*, 526 U.S. at 149-50 (1999)). Expert testimony should not be admitted if it is "speculative or conjectural," but "in accordance with the liberal admissibility standards of the Federal Rules of Evidence, only serious flaws in reasoning or methodology will warrant exclusion." *Id.* (first quoting *Jones*, 965 F.3d at 162; then quoting *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 173 (S.D.N.Y. 2009)).

Here, the Court determines that for the purposes of summary judgment both expert opinions meet the requirements of Rule 702. First, Malloy does not challenge that both experts are qualified, *see* Mot.; Reply: Adon Austin is a licensed engineer with approximately twenty-five years of experience in projects involving marine and coastal structures. Austin Report at 5, 18. He holds an M.S. in Architecture and Construction Management and a B.S. in Civil and Structural Engineering, and he specializes in "waterfront structure inspection and conditions assessment." *Id.* at 5-6. Captain Richard Bates is additionally "a licensed Master Mariner with over forty years of experience as [a] tug boat operator and captain." Bates Report at 13. More specifically, he has "over thirty years" of experience "in and around the waters of Long Island" with "recreational vessels of similar size" to the Vessel. *Id.* Second, contrary to Malloy's assertion of unreliability, *see* Reply at 2-3, both opinions are based on reliable data and methods: Austin based his opinion on his own professional experience; two site visits shortly after the Accident took place; and review of security footage of the Accident, deposition testimony, and engineering and seamanship treatises. *Id.* at 13-14; Austin Deposition at 13:11-13. Bates similarly based his opinion on security footage of the Accident, deposition testimony, a treatise on seamanship, pleadings, and his own professional experience. Bates Report at 13-14. Last, the Court determines that this

opinion testimony is relevant and helpful in determining facts in issue, namely, whether Malloy exercised reasonable diligence and whether the lag-bolted cleat presented a dangerous condition, *see* Opp'n at 17-20.

Costello's testimony is similarly admissible under Federal Rule of Evidence 701 ("Rule 701"). Rule 701 provides that a lay witness's testimony is admissible if it is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." In his deposition, Costello's corporate representative, John Costello, confirmed that his testimony was based on his personal knowledge as the principal of the company. *See* Deposition Testimony of Costello Marine Contracting, Corp. at 7:19-9:20, Dkt. 104-8. His testimony was not offered on the basis of scientific or technical knowledge within Rule 702, *id.*, and the Court determines that it is relevant to determine the issue of whether the lag-bolted cleat presented a dangerous condition, *see* Opp'n at 17-20.

Reviewing the evidence in the light most favorable to Brown, as the non-moving party, the Court finds that triable issues of fact exist as to whether Malloy breached its duty of care.

**2. There Are Genuine Issues of Material Fact as to Causation.**

To establish negligence, a party must establish both cause-in-fact and proximate causation. *Jurgens*, 113 F. Supp. 2d at 397. Cause-in-fact causation may be established either by establishing that their adversary's negligence constituted either "'a substantial factor in producing' the injury," *In re Treanor*, 144 F. Supp. 3d 381, 389 (E.D.N.Y. 2015) (quoting *Jurgens*, 113 F. Supp. 2d at 401), or that their negligence was the "but-for" cause of the injury, *see, e.g.*, *Dunn v. S. Charters, Inc.*, 539 F. Supp. 661, 671 (E.D.N.Y. 1982). Proximate causation, by contrast, is concerned with foreseeability; the injury or damage must be a probable consequence of the adversary's act or

19

omission. *See Kinsman*, 338 F.2d at 725. *See generally* 1 THOMAS J. SCHOENBAUM, ADMIRALTY & MARITIME LAW § 5-5 (7th ed. 2025). "Proximate cause is a classic jury question." *Re*, 2008 WL 4069747, at *4 (quoting *Southard v. Eight Ball, Inc.*, 96 Civ. 5542, 1997 U.S. Dist. Lexis 9907, at *14 (S.D.N.Y. July 11, 1997)). A "claimant need not establish that [their adversary's] negligence is the sole cause of the injury." *Treanor*, 144 F. Supp. 3d at 389 (citing *United States v. Reliable Transfer Co.*, 421 U.S. 397, 411 (1975)). Rather, proximate cause "can be inferred from circumstances underlying an accident and need not be demonstrated by direct evidence, but mere speculation as to the cause of injury is insufficient to establish cause." *Re*, 2008 WL 4069747, at *4 (quoting *Estate of Ratcliffe v. Pradera Realty Co.*, 05 Civ. 10272 (JFK), 2008 WL 53115, at *3 (S.D.N.Y. Jan. 2, 2008)).

In its Motion, Malloy argues that Brown puts forward "no evidence that a defect caused this accident or that a different cleat securement would have prevented this accident." Mot. at 24. Malloy asserts that "Brown's expert reports fail to provide sufficient evidence explaining *how* the alleged defect caused the injury" and that Brown's counterclaim amounts to "pure speculation." *Id.* at 24-25.

In opposition, Brown argues that he has "presented substantial evidence that Malloy's failure to install a proper and adequate cleat" was the cause-in-fact of Salazar's injuries. Opp'n at 22. As with breach, Plaintiff principally relies on the expert reports and testimony of Adon Austin and Captain Richard Bates, who state that had the cleat "been properly designed, installed, and maintained, one of two outcomes would have occurred: (1) the dock line would have become taut, stopping the boat and giving Salazar the opportunity to secure the [V]essel or untie the cleat; or (2) the line would have parted or snapped before the cleat, preventing any hardware from becoming

a dangerous projectile capable of striking Salazar." *Id.* (first citing Austin Report; then citing Bates Report).

As for proximate causation, Brown contends that he "has presented substantial evidence demonstrating that both Salazar's negligence in leaving the dock line attached, and Malloy's duty to supply a cleat able to withstand such forces, were . . . reasonably foreseeable." *Id.* at 24. Here, too, Brown chiefly relies on the expert reports and testimony of Adon Austin and Captain Richard Bates, *id.* at 24, which assert that it is a known risk that even experienced captains like Salazar can "regularly forget and leave a line attached to a cleat on the dock when departing." *Id.* (first quoting Bates Report at 2-3; then citing Austin Report at 30). While Brown concedes that "Salazar's negligence may have contributed to his injuries," he argues that "whether that negligence was an unforeseeable superseding cause is an issue of fact" properly left for the factfinder at trial. *Id.* at 25.

Reviewing the evidence in the light most favorable to Brown, as the nonmoving party, the Court finds that triable issues of fact exist as to whether Malloy's alleged breach of duty caused the Accident. As discussed above, the Court finds the opinions rendered by Austin and Bates in their export reports to be admissible. Unlike the expert report in *Lardoutsos v. Lowe's Home Improvement*, 1:21-CV-00741 (LDH) (RLM), 2023 WL 6385721 (E.D.N.Y. Sept. 29, 2023), a slip-and-fall case upon which Malloy relies, Mot. at 24, Austin's and Bates's reports do "provide sufficient evidence explaining *how* the alleged defect caused the injury," *Lardoutsos*, 2023 WL 6385721, at *4, such that a reasonable trier of fact could find that a defective dock cleat caused Salazar's injury. Malloy's "other contentions that the assumptions" in the Austin and Bates reports "are unfounded 'go to the weight, not the admissibility, of the testimony.'" *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) (quoting *Tyler v. Bethlehem Steel Corp.*, 958 F.2d

1176, 1188 (2d Cir. 1992)); *see Raskin*, 125 F.3d at 66 ("[D]isputes as to the validity of the underlying data go to the weight of the evidence, and are for the fact-finder to resolve." (citations omitted)). Further, Brown is not at this stage required to establish that Malloy's alleged negligence is the "sole cause of the injury"; issues of superseding causation and comparative fault are properly decided at trial. *Treanor*, 144 F. Supp. 3d at 389; *cf. Lombard v. Booz-Allen & Hamilton, Inc.*, 280 F.3d 209 (2d Cir. 2002) ("[F]oreseeability and causation . . . are issues generally and more suitably entrusted to fact finder adjudication . . . " (quoting *Palka v. Servicemaster Mgmt. Servs. Corp.*, 634 N.E.2d 189, 192 (N.Y. 1994))).

## CONCLUSION

Accordingly, Malloy's Motion is denied.

SO ORDERED.

                                          /s/
                                      ORELIA E. MERCHANT
                                      United States District Judge

December 17, 2025
Brooklyn, New York