UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
In the Matter of the Complaint,

of

ROBERT D. BROWN, as Owner of a 2020 42' BLUEGAME (HIN: BGM420161920)
for Exoneration from or Limitation of Liability
---------------------------------------------------------------x

**FINDINGS OF FACT**
**AND CONCLUSIONS OF LAW**
20-CV-04629 (OEM) (ARL)

ORELIA E. MERCHANT, United States District Judge:

On September 29, 2020, plaintiff Robert D. Brown ("Plaintiff") commenced this action for exoneration from or limitation of liability pursuant to the Limitation of Liability Act of 1851, 46 U.S.C. § 30501 *et seq.* ("Limitation of Liability Act"), and Supplemental Rule F of the Supplemental Rules for Certain Admiralty and Maritime Claims. *See generally* Complaint, Dkt. 1 ("Complaint" or "Compl."). This matter relates to an incident on September 20, 2020, where Plaintiff's captain, Captain Billy Salazar ("Salazar"), was struck by a cleat that was pulled out by a line that remained attached while the vessel was being operated out of the slip. *See id.* ¶¶ 5-10. All claims in this matter have been settled except for counterclaims brought by Plaintiff against Pat Malloy Waterfront LLC ("Defendant") for reimbursement of maintenance and cure paid to Salazar ("Maintenance and Cure") for Defendant's alleged proportionate fault in causing Salazar's injuries.

The Court held a bench trial from September 14, 2026, to September 17, 2026. *See generally* Transcript of Civil Cause for Bench Trial Before the Honorable Orelia E. Merchant United States District Judge ("Tr."). For purposes of trial, the parties stipulated that:

1. Plaintiff's damages arising from the Maintenance and Cure payments made to Billy Salazar are $621,000.00; and
2. The sole issue remaining for determination by the Court is the liability, if any, of

> Defendant Pat Malloy Waterfront, LLC. In the event liability is found, the Court shall also determine the apportionment of such liability.

*See* Stipulation as to Damages, Dkt. 136.

Having considered the evidence presented at trial, assessed the credibility of the witnesses, and reviewed the parties' post-trial submissions, *see generally* Plaintiff's Proposed Findings of Fact and Conclusions of Law, Dkt. 146 ("Pl.'s Br."); Defendant's Proposed Findings of Fact and Conclusions of Law, Dkt. 147 ("Def.'s Br."), the Court makes the below findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52. *See* FED. R. CIV. P. 52(a)(1) ("In an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately.").

For the following reasons, the Court concludes that Defendant is not liable to Plaintiff for the September 20, 2020 accident.

## FINDINGS OF FACT

### A. Maritime Law Lexicon

A "slip" is the area where a vessel is located on the water immediately adjacent a dock. Tr. 355:8-356:2; Pl.'s Ex. 52 (displaying a photo of the relevant slip and dock at issue).[1]

A "dock" is a wooden structure often adjacent to a slip and to which cleats are installed and to which a vessel is tied. *Id.* at 356:3-11; Pl.'s Ex. 52.

A "cleat" is an appurtenance affixed to a dock and to which a vessel's dock lines are attached to keep the vessel within the slip. *Id.* at 352:12-353:13.

A "dock line" is a rope used to secure a vessel to a dock to keep it within the slip. *Id.* at 446:11-12.

[1] The Court refers to Plaintiff's admitted trial exhibits as "Plaintiff's Exhibit" or "Pl.'s Ex." and the Defendant's admitted trial exhibits as "Defendant's Exhibit" or "Def.'s Ex.".

A "spring line" is a specialized dock line affixed to an attachment point such as a cleat to keep the vessel from "springing" forwards or backwards within the slip itself. *Id.* at 446:11-25.

A "piling" is a piece of wood drilled down into the sea floor to which boats also tie their lines. *Id.* at 272:10-13.

While facing the "bow" or front of the vessel and with "stern" or back of the vessel behind, "starboard" is the right side of a vessel and "port" is the left side of a vessel. *Id.* at 339:11-24, 444:24-449:25.

**B. Prior to the September 20, 2020 Accident**

In the summer of 2020, Plaintiff purchased a 42-foot-long Bluegame yacht named Pranzo ("Vessel") from Sanlorenzo America, LLC ("Sanlorenzo"), based in Florida. Tr. 47:23-48:2, 55:3-8. The Vessel has "twin 425-horsepower engines" and an advertised "dry weight," meaning weight "without fuel, water, and waste[,]" of 25,350 pounds. *Id.* at 171:12-172:4, 452:16-453:4, 552:18-553:10, 634:20-635:8. The Vessel also has a Volvo Penta IPS propulsion system "'joystick' option which allows you to operate that system without fully engaging the engines themselves[,]" allowing for greater mobility, and is "available to mariners who are looking to dock vessels in difficult spots or in tricky locations." *Id.* at 50:18-51:13.

After purchase, Plaintiff hired Salazar to transport the Vessel from Sanlorenzo to Sag Harbor, New York. *Id.* at 48:3-11, 54:16-55:8, 58:13-61:8; Def.'s Ex. C at 1 (displaying text messages between Plaintiff and Salazar). Plaintiff rented Slip 31 on the west floating dock at Defendant's waterfront marina in Sag Harbor, New York ("Defendant's Marina") to dock the Vessel. Tr. 56:12-20, 57:13-25. Although Plaintiff was originally informed Defendant's Marina had no spots available for the Vessel, Plaintiff utilized his relationships at Sanlorenzo to secure one. *Id.* at 55:9-57:25. Plaintiff had docked his smaller vessel (a 23-foot Hackercraft) at

Defendant's Marina the previous season, booking through the Defendant's dockmaster, Mr. Christopher Trent-Keady ("Trent-Keady"). *Id.* at 48:12-49:24. Plaintiff did not sign a rental agreement for Slip 31; to make the reservation, Trent-Keady assigned Plaintiff to Slip 31, which was one of the only slips available in August 2020, and charged Plaintiff's credit card already on file from the previous booking. *Id.* at 56:18-57:25, 148:14-151:16. Plaintiff rented Slip 31 for two periods of time: (1) August 14, 2020, to September 15, 2020, and (2) September 17, 2020, to October 15, 2020. Def.'s Ex. A (receipt displaying Plaintiff's transient reservation and an unsigned rental agreement), at 1-2. The terms and conditions of the unsigned rental agreement state that renters accept the slip location "as is" and are "responsible for damages and injuries which they, their guests, agents, or servants may cause to other persons, vessels or property in and about the" Defendant's marina. *Id.* at 3.

**C. The Accident**

Once in Sag Harbor, Salazar continued to work for Plaintiff as captain of the Vessel. Tr. 90:23-91:4. Plaintiff relied on Salazar, in his capacity as captain, to operate the Vessel safely, including docking and undocking the Vessel in a correct and safe manner. *Id.* at 91:16-92:19. In this capacity, Salazar replaced the Vessel's original dock lines with stronger lines, finding the originals inadequate. *Id.* at 90:17-98:9. Neither Salazar nor Plaintiff made any complaints about the state of Slip 31. *Id.* Salazar took Plaintiff and his guests on outings on the Vessel around three times per week, including an outing on September 19, 2020. *Id.* at 98:10-25, 100:17-103:1. Plaintiff and Salazar returned from the September 19, 2020, outing after sunset, and Salazar docked and tied up the Vessel. *Id.*

The next day, September 20, 2020, at 10:48 a.m., Plaintiff texted Salazar: "Working on plan for the day. Seems we may go out for a ride around 2 or 3pm. We then might want to go over

to North Sea for dinner - depending on weather of course." Def.'s Ex. C at 77. Salazar responded: "I'll be standing by. Wind picked up from yesterday." *Id.* At 2:30 p.m., Plaintiff notified Salazar that he and his guests would arrive shortly: "We will be at boat between 3 and 3:30." *Id.* Prior to arriving at Slip 31, Plaintiff had not seen or spoken to Salazar that day; the two had only communicated by text. Tr. 105:7-19.

Shortly after 3:00 p.m., Salazar prepared the ship for departure, removing the dock lines and spring lines from the Vessel without assistance from Plaintiff or any of Defendant's staff. *Id.* at 75:2-78:25, 106:1-17; Pl.'s Ex. 44 (video of the September 20, 2020 incident). Salazar untied the bow line that was attached to one of the cleats ("Cleat A") on the port side stern (left back of boat). Pl.'s Ex. 44; Pl.'s Ex. 70.1 (displaying a schematic of Slip 31). However, Salazar failed to untie a port spring line that was attached to another cleat ("Cleat B") on the west floating dock adjacent to Slip 31. Tr. 75:2-78:25; Pl.'s Ex. 44; Pl.'s Ex. 70.1. Cleats A and B were located directly next to one another. Pl.'s Ex. 70.1. The spring line attached to Cleat B would prevent the Vessel from moving backwards into the dock, but it would not prevent the Vessel from moving forward away from the dock by as much as 50 feet. Tr. 446:23-447:6, 476:15-477:10.

At around 3:13 p.m., Salazar departed the Vessel from Slip 31 at idle or clutch speed of around four knots, using the Vessel's Volvo Penta IPS propulsion system with a joystick control. *Id.* at 346:3-347:21, 463:9-464:29, 551:25-552:17; Pl.'s Ex. 44. Plaintiff testified that he felt some resistance and communicated to Salazar: "Billy, we're still tied up." Tr. 78:3-23, 107:13-15. After the Vessel traveled 40 to 50 feet forward, the still tied spring line pulled Cleat B, as well as a piece of the adjacent Cleat A, out of the dock and one of the two cleats struck Salazar in the head, severely injuring him. *Id.* at 107:24-108:2, 78:16-25; Pl.'s Ex. 70.1. Cleat B has never been found. Tr. 427:17-25. Upon realizing what occurred, Plaintiff directed his guests to call 911 and

maneuvered the Vessel back into Slip 31. *Id.* at 79:1-10. Trent-Keady, who had heard a loud noise from his office on the dock followed by a call for help, arrived at Slip 31 to help Plaintiff tie up the Vessel. *Id.* at 221:21-222:17. Salazar, partially decapitated, was removed from the scene by EMS and transported to Stony Brook Hospital. *Id.* at 78:16-25, 81:20-82:13.

At 4:35 p.m., on September 20, 2020, an hour and twenty minutes after the accident, Stonybrook medical personnel drew a blood sample from Salazar. Def.'s Ex. AZ, at 45-46. The test results report "Ethanol Level 136mg/dL HI." *Id.* at 46. At 5:35 p.m., Stonybrook medical personnel collected a urine sample for testing, which detected the presence of ethanol and fentanyl. *Id.* at 45 (stating: "Urine Drug Screen, Ethanol POSTIVE. Not confirmed." and "Urine Drug Screen, Fentanyl POSITIVE. Not confirmed.").[2] The urine screen contained a disclaimer, while the blood screen did not. *Id.* at 45-48.

**D. Operations of Defendant's Marina**

At trial, Trent-Keady, and Sienna Fabiano ("Fabiano"), who were employed by Defendant's Marina as dockmaster and dockhand, respectively, at the time of the accident in September 2020, testified as fact witnesses. Tr. 126:21-127:17, 250:1-21. Trent-Keady began working for Defendant as a dockhand in 2011 and became dockmaster in 2015. *Id.* at 127:10-25. Fabiano was hired by Defendant as a dockhand in 2015 and has been working on docks since she was 13-years old. *Id.* at 266:1-9. As dockmaster, Trent-Keady serves as general manager of Defendant; part of his duties include annually inspecting the docks and their fittings during the spring, prior to the Defendant's May 1 opening for boating season. *Id.* at 128:1-12. This includes

[2] To the extent the Defendant argues that Salazar was under the influence of ethanol or fentanyl at the time of the accident, the evidence is insufficient to support that conclusion. Under the circumstances presented, the Court finds that Salazar's test results alone are not enough. Here, it is just as plausible, if not more likely, that Salazar's elevated ethanol and fentanyl levels reported from samples taken over an hour and twenty minutes after the accident were as a result of medical treatment, provided either by EMS or Stony Brook medical personnel after the accident which rendered him partially decapitated.

confirming "the[ cleats] are sealed and not prone to any shifting due to weather," ensuring "that the wood [a cleat is] anchored into is in good strength" and "taking [a cleat] by the hands [or with a rope] and pulling it around[,]" in order "to see if there's any give." *Id.* at 128:10-129:25, 188:1-25. Trent-Keady testified that in spring 2020, he performed this annual inspection process, including inspection of the west floating dock, Slip 31, and each cleat therein. *Id.* at 129:15-130:6, 187:11-25. In addition to the annual inspection, Trent-Keady and Fabiano testified thatDefendant staff members, including themselves, routinely walked the docks on a daily basis to ensure the docks are in good order. *Id.* at 190:12-20, 193:11-14, 272:19-273:9. If a dockhand noticed anything of concern, they would notify Mr. Trent-Keady, who would address the issue promptly. *Id.* at 190:12-20. During the boating season, including September 20, 2020, dockhands worked and remained available to assist mariners at the dock during Defendant's hours of operation, 9:00 a.m., to 5:00 p.m. *Id.* at 180:12-18, 217:21-219:5. Plaintiff holds Defendant's marina in "very high regard" and as "always willing to lend a hand when asked for assistance." *Id.* at 94:14-23.

John Costello ("Costello"), owner of Costello's Marine Contracting, also testified to the operations at Defendant's marina. *Id.* at 291:1-21. Costello is the contractor that Defendant uses to repair its docks, and his company has been hired by Defendant each year for the last 10 to 15 years. *Id.* at 185:11-23, 324:22-25. Costello has worked in marine construction since 1962 and started Costello's Marine Contracting in 1974. *Id.* at 290:8-294:19. Defendant hires Costello annually to undertake maintenance and repairs to the docks based on a list provided to Costello by Defendant's dockmaster prior to the marina's opening, including during the winter and spring of 2020. *Id.* at 297:12-298:25, 328:7-329:9. Costello's work includes, for example, "chang[ing] a piling or pilings . . . and/or replac[ing] decking and/or reinforc[ing] some of the timbers in the

sections or remove sections that were un-functional[,]" as well as changing bolts and hinges on floating docks. *Id.* at 299:15-25. In addition, Costello is asked by Defendant to annually inspect the dock and flag any necessary repairs. *Id.* at 132:20-133:19, 300:8-25. Costello testified that he does not recall ever being hired to specifically inspect or repair the cleats on floating docks until after Salazar's accident, but if he ever noticed one was missing, he would have advised Defendant, and could not think of an instance in which Defendant did not authorize repairs Costello thought necessary. *Id.* at 301:7-18, 307:4-13, 327:6-9.

Slip 31 is located on the west floating dock at Defendant's Marina. *Id.* at 261:5-12. The west floating dock was manufactured by a Canadian company. *Id.* at 307:16-18. After the west floating dock's arrival, Costello oversaw installing the piling to hold the west floating dock in place. *Id.* at 307:19-25. Costello testified that the west floating dock arrived from the manufacturer to Defendant's Marina with the cleats already affixed, ranging from eight to ten inches in size. *Id.* at 307:19-25, 309:20-310:7. Costello testified he did not perform the installation of any cleats on Slip 31. *Id.* at 302:3-5. Trent-Keady testified that neither him nor his dockhands ever installed cleats anywhere on the dock. *Id.* at 184:17-185:10. After the accident, Costello inspected the dock adjacent to Slip 31 and testified that the cleat, which had been ripped from the dock, was lag-bolted, while the other cleats installed on the dock were through-bolted. *Id.* at 322:13-323:17.

Slip 31 is approximately 30 feet long and nearly 20 feet wide. *Id.* at 449:23-450:20; Pl.'s Ex. 70.1. At the time of the accident, there were five cleats located on Slip 31. Tr. 450:18-20. Cleats A and B, at the forward end (bow) of the Vessel, were placed close together. *Id.* at 456:1-11. Cleat B was smaller than the rest of the cleats on Slip 31 and estimated to have been 6-inches in size. *Id.* at 404:19-405:7, 451:3-20, 560:3-17. The parties were never able to establish who

installed Cleat B to Slip 31. *Id.* at 626:22-25. The spring line attached to Cleat B was estimated to be approximately 25 feet long. *Id.* at 370:24-371:8.

**E. Industry Standards**

Three expert witnesses testified at trial. Plaintiff relies on the testimony of two expert witnesses: Captain Richard Bates ("Bates"), whom the Court deemed qualified to offer expert testimony in vessel operations, Tr. 332:5-336:1; and Adon Austin ("Austin"), whom the Court deemed qualified to offer expert testimony in dock design and dock assessment. *Id.* at 420:5-425:11. Bates has 48 years of experience operating vessels, holds several professional licenses relating to vessel operations, and is currently employed by McAllister Towing of New York as a master of a 100-foot tugboat. *Id.* at 332:15-333:25. Austin is a licensed professional engineer and waterfront engineering consultant. *Id.* at 420:5-425:11. Defendant relies on the testimony of expert Claudio Crivici ("Crivici"), whom the Court deemed qualified to offer expert testimony in the field of marine accident investigations. *Id.* at 501:21-519:20. Crivici, as the principal consultant and owner of Castle Rock Risk Services, is a marine accident investigator and inspector, working in the field for 41 years. *Id.* at 501:21-503:8.

All three experts agree that mariners may forget to untie dock lines, as Salazar did with the spring line attached to Cleat B, and the Court credits that it is a known risk that a mariner may forget to untie a dock or spring line from a cleat. However, the experts disagree on how rare such an occurrence is, and whether marina industry standards require dock design to account for the possibility of this human error.

Austin testified that "at times, dock lines are forgotten" and that the industry's "progressive failure philosophy[,]" by which "features that result in the least amount of damage or potential harm [should] fail first[,]" is standard practice to account for the potential for human error. *Id.* at

462:2-469:25. Austin testified that if Defendant's dock met this progressive failure standard, the spring line would have broken prior to Cleat B being pulled loose, and less damage would have resulted. *Id.*

Bates testified that a mariner forgetting to untie a dock line "doesn't happen often" and "possibly happens rarely, but it does happen" and that "[u]sually what happens is there's a little bit of tension in the air and the boat suddenly comes to a stop or the boat jerks[.]" *Id.* at 338:1-16, 358:6-19. Bates also testified that docks are designed so that "lines break, not cleats," such that "a reasonable mariner [would] be entitled to rely on the security of a cleat when either docking or undocking." *Id.* at 343:6-8, 406:24-407:2.

Crivici, on the other hand, testified that this was "an extremely abnormal situation[,]" that in his 50 years as a mariner he has never left the dock without untying something, and that in the event this does occur "most mariners would realize that they have a resistance on their boat and slow the boat down" rather than relying on a progressive failure philosophy. *Id.* at 654:5-657:12.

All three experts also agree that lag-bolted cleats cannot withstand an applied force as well as through-bolted cleats, because of the manner in which each is affixed to a dock. *Id.* at 348:6-21, 435:1-24, 586:10-587:11. The Court credits that, on average, through-bolted cleats can withstand a stronger applied force than lag-bolted cleats. The experts disagree, however, on whether industry norms require the use of through-bolted cleats at marinas.

Austin and Bates testified that through-bolted cleats, by resisting greater force, contribute to the progressive failure system and provide a vessel operator with a greater margin of error and the opportunity to feel the tug of the line and stop the vessel's engines before a cleat fails. *Id.* at 338:6-341:2, 345:4-356:25, 457:5-458:21, 468:1-469:18. As vessels regularly use cleats to assist in maneuvers for docking and undocking, such as "pivoting," they testified marinas should attach

cleats to their dock with a method that provides sufficient strength to resist the applied loads of vessels under power. *Id.* Bates elaborated that lag bolts are commonly used at recreational marinas, and that while he has never used a lag bolt himself, he has tied up to one. *Id.* at 399:7-13. Austin also testified that there is no regulation that prohibits the use of lag-bolted cleats or requires the use of through-bolted cleats, but that the American Society of Civil Engineers design manual notes a preference for through-bolts. *Id.* at 400:23-25, 485:5-486:3. According to Austin, Cleat B was not defectively manufactured or improperly installed, and the dock was not in a state of decay, but "[a]ny lag-bolted cleat is poorly affixed to the dock." *Id.* at 496:1-497:2. Austin also testified that for a boat of Plaintiff's size, the American Society of Civil Engineers advises that 15-inch, not 6-inch, cleats should be used and that the spacing and placement of the cleats within Slip 31 was inadequate. *Id.* at 453:13-15, 545:2-546:15.

Crivici testified that lag-bolted cleats, like Cleat B, are commonly used in marinas, and especially in floating docks. *Id.* at 586:10-587:11. Crivici explained that "[t]he biggest problem with the lag-boated cleats is that sometimes over time, they could loosen due to various reasons, and in that instance, [he] do[es] have a concern" but he "did not notice any indication whatsoever that this cleat was loose." *Id.* at 587:1-11; Def.'s Ex. V (displaying video of an individual trying to remove the lag bolt from Cleat B after the accident). Additionally, Crivici testified that although cleats can be relied on to hold while mariners perform certain dock maneuvers such as pivoting, what happened here was instead an "abnormal departure with the line going slack and suddenly being taught, with the load transferred [from] the line to the cleat" making it "an extreme event that, in [his] opinion, a mooring cleat is not intended to withstand." Tr. 582:21-583:14. Austin agreed the manner in which Salazar departed the slip was not an accepted docking maneuver of any kind. *Id.* at 482:1-483:11. In Crivici's view, mooring systems such as that at Slip 31 are

designed to share the load of a vessel through multiple secure points. *Id.* at 562:8-12, 582:18-583:21. The cleats and pilings of a mooring system operate as a whole, and no single cleat is supposed to function independently from the rest of the mooring system. *Id.* If a mariner were to rely on a single point, Crivici testified a piling is "significantly stronger" than a cleat and may be used for the same purpose. *Id.* at 569:6-575:24, 578:11-579:10. Slip 31 had several "Greenheart" pilings which are known in the industry for their quality material and strength. *Id.*; Pl.'s Ex. 70.1.

**F. What Went Wrong**

In totality, each expert drew different conclusions regarding what went wrong leading up to the September 20, 2020 accident. The Court finds Crivici's opinion to be more credible than Austin's or Bates's.

Austin testified that a vessel of the size and propulsion system as Plaintiff's would require a 40-foot length slip, with six, equally spaced, 15-inch, through-bolted cleats to be properly berthed or docked. Tr. 449:1-469:18. As a result, according to Austin, Slip 31—30 feet long, with five cleats, two of which were unevenly spaced, and Cleat B being a six-inch lag-bolted cleat—was inadequately equipped for Plaintiff's Vessel. *Id.* at 462:2-469:18. According to Austin and Bates, had the docking system at Slip 31 been properly, inspected, sized, and equipped with the adequately sized, number, and placement of cleats, then the cleat would have been able to withstand more force and the injuries to Salazar would not have occurred. *Id.* at 462:2-469:18, 338:6-356:25. Bates stated that a fair summary of his opinion is that the cleat that failed, Cleat B, was inadequate. *Id.* at 362:22-363:2. Austin testified that if Cleat B had been 15-inches, rather than 6-inches, he does not believe the cleat would have failed because the "shear strength" would have "provide[d] adequate resistance against" the Vessel. *Id.* at 465:11-21. Austin also testified

that Defendant's marina was not properly inspected, as no duly licensed engineer inspected the marina, and the dockmaster was not qualified. *Id.* at 466:12-21.

Crivici testified that what happened here was "an extremely abnormal" "rogue event" and that no single cleat, whether lag-bolted or through-bolted, is designed or intended to withstand the shock load of a 28,000-pound boat accelerating freely for approximately 50 feet at a speed of approximately four knots. *Id.* at 562:8-12, 582:18-583:21, 601:16-602:22, 655:18-657:12. Cleat B, according to Crivici, was suitable for its intended purpose—to serve as one attachment point of a larger system utilized to secure a vessel—but such a cleat is never intended to be "put under [a] significant amount of unusual and unanticipated strength" from a "shock load." *Id.* at 600:21-602:12. Additionally, Crivici testified that even if the line broke first, consistent with Austin's progressive failure philosophy, the impact of a broken line can cause "serious injuries with amputations, loss of eyes, facial fractures[.]" *Id.* at 655:4-17. Crivici also testified that a captain has a responsibility to know what size cleat his vessel has been tied to. *Id.* at 591:14-18. Crivici opined that no characteristics of Slip 31, such as its length, or any alleged deficiencies within that slip, such as the subject cleat, nor any acts or omissions by Defendant, caused or contributed to the accident. *Id.* at 593:21-595:18, 602:13-604:21. Rather, Crivici testified that "the sole cause of this incident was the failure to untie that dock line." *Id.* at 604:22-605:2.

First, the Court does not credit Austin's opinion that "[a]ny lag-bolted cleat is poorly affixed to the dock," nor Bates's opinion articulating the same. *Id.* at 496:1-497:2. Neither Austin nor Bates established that there is an industry custom requiring the use of lag-bolted cleats. In fact, Austin admits there is no regulation requiring the use of lag-bolted cleats. *Id.* at 400:23-25, 485:5-486:3. Further, Bates acknowledges that lag bolts are commonly used by marinas, and that he himself has tied up to them in the past. *Id.* at 399:7-13. Bates was comfortable enough to rely

on lag bolts; having this, without more, the Court cannot credit Bates's testimony that other mariners should not be comfortable doing so as well.[3]

Moreover, the Court finds Crivici's opinion that mariners rely on the operation of the holistic mooring system, rather than relying on any individual cleat, to be most credible. Austin's application of the progressive failure philosophy to the events of September 20, 2020 is not credible. Indeed, Austin admits that Salazar was not attempting any typical maneuver when Cleat B pulled loose. *Id.* at 482:1-483:11. Neither Salazar nor Plaintiff had a reasonable expectation to rely on Cleat B remaining secured to Defendant's dock while Salazar drove Plaintiff's Vessel 40 to 50 feet away from the dock at approximately four knots. The shock load of a 28,000-pound boat accelerating freely for approximately 50 feet at a speed of approximately four is "an extreme event that . . . a mooring cleat is not intended to withstand." *Id.* at 582:21-583:14.

## CONCLUSIONS OF LAW

After considering the trial testimony and all the evidence, the Court concludes that Defendant is not liable to Plaintiff for the September 20, 2020 accident.

### A. Legal Standard

Plaintiff, as Vessel owner, asserts claims against Defendant for reimbursement of Maintenance and Cure paid to Salazar for Defendant's alleged proportionate fault in causing Salazar's injuries. The parties do not dispute that Plaintiff paid a settlement in the total amount of $870,861.39 to Salazar as compensation for injuries he sustained while working as a Jones Act

[3] Further, the inconsistencies in Austin's testimony as to the cause of the September 2020 event cut against his credibility. Austin elaborates extensively regarding why the lag-bolted cleats are inadequate but then opines that if Cleat B had been 15-inches, rather than 6-inches, without mention of the type of bolting, that he does not believe the cleat would have failed because the "shear strength" would have "provide[d] adequate resistance against" the Vessel. *Id*. at 465:11-21. Austin also states that if the slip was adequately sized at 42 feet long rather than 30 feet long then "the spring line would have come taut prior to the vessel leaving the slip." *Id.* at 467:13-468:3. It is unclear what Austin believes substantially contributed to the failure on September 20, 2020, when he testifies that had the docking system at Slip 31 been properly, inspected, sized, and equipped with the adequately sized, number, and placement of cleats, then the injuries to Salazar would not have occurred. *Id.* at 462:2-469:18.

Seaman. To prevail on his indemnity-and-contribution claims, Plaintiff need only establish that Defendant's negligence contributed to Salazar's injuries. "[I]n *all* cases where reimbursement is sought for maintenance and cure," such as here, the alleged third-party tortfeasor's liability is limited to its proportionate share of fault. *Black v. Red Star Towing & Transp. Co*., 860 F.2d 30, 34 (2d Cir. 1988) (emphasis original).

The elements to establish a claim of negligence under maritime law in a limitation-of-liability case are the same as the elements of negligence under common law, in other words: duty, breach, causation, and damages. *In re Re*, 07-CV-223 (JFB)(MLO), 2008 WL 4069747, at *3 (E.D.N.Y. Aug. 27, 2008); *Jurgens v. Poling Transp. Corp*., 113 F. Supp. 2d 388, 396-97 (E.D.N.Y. 2000). Federal maritime law incorporates common-law negligence principles, and aligns with New York State's common-law negligence principles. *See Int'l Ore & Fertilizer Corp. v. SGS Control Servs., Inc.*, 38 F.3d 1279, 1284 (2d Cir. 1994); *Becker v. Poling Transp. Corp.*, 356 F.3d 381, 388 (2d Cir. 2004), *as modified* (Feb. 27, 2004) (applying New York State common-law negligence principles in a maritime tort action); *Vasquez v. GMD Shipyard Corp.*, 582 F.3d 293, 301 n.3 (2d Cir. 2009) (same). The burden of proof lies with the party asserting negligence. *United States v. Mowbray's Floating Equip. Exch., Inc.*, 601 F.2d 645, 646-47 (2d Cir. 1979).

**B. Application of Law**

**1. Duty**

In *Smith v. Burnett*, the Supreme Court established that a wharfinger owes a duty of care to vessels while they are in port. 173 U.S. 430 (1899); *see also Vaccaro v. Waterfront Homes Marina*, 10 Civ. 4288 (NRB), 2012 WL 1744738, at *8 (S.D.N.Y. May 15, 2012) (A marina has the duty "to provide a safe and secure dock"). Although not obliged to "guarantee the safety of vessels coming to [its] wharves," a wharfinger such as Defendant must "exercise reasonable diligence in ascertaining the condition of the berths thereat, and if there is any dangerous

obstruction to remove it, or to give due notice of its existence to vessels about to use the berths." *Mowbray's Floating Equip.*, 601 F.2d at 646 (quoting *Smith*, 173 U.S. at 433).[4] The duty owed by a wharfinger is akin to that of a landowner under New York State law. *Compare Mowbray's Floating Equip.,* 601 F.2d at 646 with *Kissoon v. Wal-Mart Real Est. Bus. Tr.*, 24-2822, 2025 U.S. App. LEXIS 29320, at *3 (2d Cir. Nov. 7, 2025) ("To succeed on a premises liability claim alleging any injury caused by a defective condition, the plaintiff must demonstrate that the defendant 'either created the defective condition, or had actual or constructive notice thereof for such a period of time that, in the exercise of reasonable care, it should have corrected it.'"). Here, Defendant, as a wharfinger, owed a duty to the Plaintiff to conduct reasonable inspections to ascertain that the dock was in safe condition, and if there were any dangerous conditions, to either remove them or warn Plaintiff of their presence. *See* Order Denying Motion for Judgment on the Pleadings and Motion for Summary Judgment at 15, Dkt. 105.

**2. Breach**

Next, the Court analyzes whether this duty was breached. Plaintiff alleges Defendant breached its duty by providing Plaintiff with an inadequately sized and improperly equipped dock, including "by allowing a small six-inch cleat that was lag bolted and placed too close to a larger eight-inch cleat that was through bolted, and which was dangerous and defective to be installed on its dock, which the Defendant knew or should have known, and by failing to either remedy the condition or warn the vessels berthed at Slip #31 of this condition." Pl.'s Br. ¶¶ 52-54. The Court finds Plaintiff did not establish that Defendant breached its duty.

---

[4] A wharfinger's duty owed to vessels in port does not detract from a seaman's, here Salazar's, distinct duty to "use ordinary care" and not "carelessly run into danger." *Smith*, 173 U.S. at 433. A seaman must "act with the care, skill, and ability expected of a reasonable seaman in like circumstances." *Manhattan by Sail, Inc. v. Tagle*, 873 F.3d 177, 183-84 (2d Cir. 2017) (quoting *Gaylor v. Canal Barge Co., Inc.*, 14-2398, 2015 WL 5321756, at *2 (E.D. La. Sep. 11, 2015) (*citing Gautreaux v. Scurlock Marine, Inc.,* 107 F.3d 331, 339 (5th Cir. 1997))).

First, Plaintiff did not establish that Defendant failed to exercise reasonable care in inspecting the condition of the dock. Defendant submitted unrebutted testimony by its dockmaster Trent-Keady and dockhand Fabiano that Defendant has an annual inspection process by which it examines all the docks and their fittings prior to the season start, and hires Defendant's contractor, Costello, thereafter, to make any necessary repairs and perform an additional inspection of his own. Tr. 128:1-129:25, 132:20-133:19, 188:1-25. Costello's testimony corroborated this process and verified that the process was completed in 2020 prior to Defendant's opening. *Id.* at 297:12-298:25, 300:8-25, 328:7-329:9. Defendant staff members additionally walk the docks daily to ensure they are in good order. *Id.* at 190:12-20, 193:11-14, 272:19-273:9. Plaintiff's expert's conclusory testimony that Defendant's dock was not properly inspected because no duly licensed engineer inspected the marina, without pointing to support for such a requirement, is insufficient to rebut Defendant's testimony. *Id.* at 466:12-21.

Plaintiff essentially asks the Court to infer, based on the occurrence of the September 20, 2020 accident, that Defendant did not exercise reasonable care in ascertaining the condition of the dock. *See* Pl.'s Br. ¶ 33 ("Had the docking system at Slip #31 at Waterfront Marina on September 20, 2020, been properly, inspected, sized, and equipped with the adequately sized, number, and placement of cleats, then the injuries to Captain Salazar would not have occurred"); *Id.* ¶ 48 ("a dock which was adequately inspected and sized, and equipped with properly sized cleats, would have withstood the normal and expected forces of a 42-foot vessel such as the Bluegame utilizing a single cleat to arrest its momentum when a single spring line is forgotten when undocking or pivoting into or out of the Slip"). The Court will not infer Defendant breached its duty to inspect the dock based solely on Salazar's injuries, particularly given Plaintiff has not established that

there was a dangerous condition at Slip 31 in the first place. The Court finds that Defendant conducted reasonable inspections to ascertain that the dock was in safe condition.

Again, Defendant owed a duty to the Plaintiff to conduct reasonable inspections to ascertain that the dock was in safe condition, and if there were any dangerous conditions, to either remove them or warn Plaintiff of their presence. But Plaintiff fails to establish any dangerous conditions.[5] Plaintiff's expert, Austin, did not believe Cleat B was defectively manufactured, improperly installed, or that the dock was in a state of decay, but rather that "[a]ny lag-bolted cleat is poorly affixed to the dock." *Id.* at 496:1-497:2. As articulated *supra*, the Court does not credit the opinion that lag-bolted cleats are inherently dangerous. There is no regulation requiring the use of through-bolted cleats at docks, and lag-bolted cleats are regularly utilized. *Id.* at 399:7-13, 400:23-25, 485:5-486:3. Austin's expert testimony regarding other alleged dangerous conditions, such as the estimated six-inch size and spacing of Cleat B, as well as the length of Slip 31 itself, was both facial and rebutted. Bates did not testify to these conditions. Austin's opinion that for a boat of Plaintiff's size that 15-inch, not six-inch, cleats must be used was, like Austin's opinion on lag-bolted cleats, based on guidance by the American Society of Civil Engineers rather than any industry regulation or well-established norm. *Id.* at 453:13-15, 545:2-546:15. Austin's testimony regarding the size of Slip 31 and the spacing of its cleats pointed to no basis at all.

Plaintiff's analogy to *Vaccaro* is also inapt. 2012 WL 1744738 (S.D.N.Y. May 15, 2012). In *Vaccaro*, unlike here, the condition of the metal brackets in question, which were "heavily corroded by rust," "constitute[d] a breach of the marina's duty to provide a safe and secure dock." *Id.* at *8. Based on the dangerous condition of the corroded brackets, the *Vaccaro* Court concluded that the "marina employees either failed to diligently inspect the service dock . . . or failed to report

[5] As the Court finds there were no dangerous conditions, the Court need not address Defendant's alternative argument that any dangerous condition was open and obvious. *See* Def.'s Br. ¶¶ 68-74.

the state of the brackets[.]" *Id.* There is no such dangerous condition here; thus, there is no basis on which to similarly infer a failure to inspect the dock.

At bottom, the condition of Slip 31 did not constitute a breach of Defendant's duty to provide a safe and secure dock. Since there was no dangerous condition, Defendant's duty was discharged once it conducted reasonable inspections to ascertain the dock was in a safe condition. *See Am. S.S. Co. v. Erie-Lackawanna R.R. Co.*, 352 F.2d 794, 795 (2d Cir. 1965) (affirming trial court's judgment that wharfinger was not negligent where "there was no hidden, unusual or dangerous condition at the berth . . ."). As such, Defendant had no further duty to remove or warn of a nonexistent dangerous condition.

**3. Causation**

As Plaintiff has not established that Defendant breached its duty, the Court need not reach causation. However, even assuming arguendo that Defendant breached its duty, Plaintiff fails to establish causation.

To establish a claim for negligence, a party must establish both cause-in-fact and proximate causation. *Jurgens*, 113 F. Supp. 2d at 397. Cause-in-fact causation may be established either by demonstrating that their adversary's negligence constituted "'a substantial factor in producing' the injury," *In re Treanor*, 144 F. Supp. 3d 381, 389 (E.D.N.Y. 2015) (quoting *Jurgens*, 113 F. Supp. 2d at 401), or that their negligence was the "but-for" cause of the injury, *see, e.g.*, *Dunn v. S. Charters, Inc.*, 539 F. Supp. 661, 671 (E.D.N.Y. 1982). Proximate causation, by contrast, is concerned with foreseeability; the injury or damage must be a probable consequence of the adversary's act or omission. *See In Re Kinsman Transit Co*., 338 F.2d 708, 725 (2d Cir. 1964). *See generally* 1 THOMAS J. SCHOENBAUM, ADMIRALTY & MARITIME LAW § 5-5 (7th ed. 2025). Proximate cause "can be inferred from circumstances underlying an accident and need not be demonstrated by direct evidence, but mere speculation as to the cause of injury is insufficient to

establish cause." *Re*, 2008 WL 4069747, at *4 (quoting *Estate of Ratcliffe v. Pradera Realty Co.*, 05 Civ. 10272 (JFK), 2008 WL 53115, at *3 (S.D.N.Y. Jan. 2, 2008)).

**a. Cause-in-Fact**

"Cause-in-fact refers to those antecedent events, acts or omissions, which have so far contributed to the result that without them it would not have occurred." *Aegis Ins. Servs., Inc. v. 7 World Trade Co., L.P.*, 737 F.3d 166, 178 (2d Cir. 2013). Under the comparative fault doctrine, a plaintiff only needs to prove that the defendant's negligence was a cause of the injury, defendant's negligence does not need to be the sole cause of the injury. *See United States. v. Reliable Transfer Co.*, 421 U.S. 397, 406 (1975); *see also Treanor*, 144 F. Supp. 3d at 389 (citing *Reliable Transfer Co*., 421 U.S. at 411 (noting a "claimant need not establish that [their adversary's] negligence is the sole cause of the injury"). "Plaintiff asserts there is substantial evidence that the Defendant's failure to properly install and inspect a cleat on its dock or in failing to detect the existence of the smaller improperly affixed cleat and to provide an adequate slip, with respect to length, cleat size, and cleat location, caused Captain Salazar's injuries, as it was the inadequate cleat that failed and struck Captain Salazar in the head, nearly decapitating him." Pl.'s Br. ¶ 61. Plaintiff analogizes to the bracket "heavily corroded by rust," in *Vaccaro*, as there the Court found the "evidence [] sufficient to establish that the corroded brackets were a cause in fact" of the damages at issue. 2012 WL 1744738, at *9.

Plaintiff's arguments fall short for two main reasons. First, Plaintiff has not established that a differently sized or fastened cleat would have withstood the force of Plaintiff's Vessel departing Slip 31 on September 20, 2020. Austin opined that had the docking system at Slip 31 at Defendant's marina on September 20, 2020, been properly, inspected, sized, and equipped with the adequately sized, number, and placement of cleats, then Cleat B would have been able to withstand more force and the injuries to Salazar would not have occurred. Tr. 462:2-469:18,

465:11-21. However, Austin provided no force calculation to support that opinion, finding he could not "accurately determine the velocity of the [V]essel," an input on which the force calculation relies. *Id.* at 489:14-490:11. In other words, Austin's opinion that the injuries would not have occurred but-for Slip 31's alleged deficiencies was speculative. Second, and relatedly, Defendant has successfully established that even if the Court credits Plaintiff's preferred progressive failure philosophy, that the spring line should break before a cleat is pulled loose, there is no basis to conclude that a broken spring line would not also have seriously injured Salazar. *Id.* at 655:4-17. In other words, Plaintiff could not show that if not for the alleged inadequacies in Defendant's dock, Salazar's injuries would have been avoided.

**b. Proximate Causation**

Plaintiff alleges that the inadequacies of Defendant's dock were the proximate cause of Salazar's injuries. "Proximate cause . . . limits a defendant's liability to those foreseeable consequences that the defendant's negligence was a substantial factor in producing." *Bonsignore v. City of New York*, 683 F.2d 635, 637 (2d Cir. 1982). In some instances, an intervening act of negligence by either a plaintiff or a third party may "sever the causal connection between the defendant's conduct and the plaintiff's injury, and constitute a superseding event which relieves the defendant of liability" on that matter. *Lapidus v. State*, 57 A.D.3d 83, 95, (2d Dep't 2008). "[F]or the plaintiff's conduct to constitute a superseding cause, the plaintiff's 'negligence must be more than mere contributory negligence, which would be relevant in apportioning culpable conduct. Rather, in addition to being unforeseeable, [plaintiff's negligence] must rise to such a level of culpability as to replace the defendant's negligence as the legal cause of the accident." *Id.* at 96 (internal citations omitted); *see also Jurgens*, 113 F. Supp. at 401 ("The foreseeable intervening negligence of a plaintiff or a third party 'may reduce, but does not bar, recovery for

personal injuries, that is, the plaintiff's recovery is reduced in proportion to his own fault.'" (citing *Pope & Talbot, Inc. v. Hawn*, 346 U.S. 406, 408–09 (1953)).

Whether a subsequent act of negligence absolves the defendant of liability hinges on whether the act is extraordinary under the circumstances and, therefore, not foreseeable. *Lapidus*, 57 A.D.3d at 95; *see also Spencer v. Lab'y Corp. of Am. Holdins*, 19-CV-04927 (JMA) (ARL), 2024 U.S. Dist. LEXIS 139633, at *33 (E.D.N.Y. Aug. 6, 2024) ("An intervening act will be deemed a superseding cause and will serve to relieve defendant of liability when the act is of such an extraordinary nature or so attenuates defendant's negligence from the ultimate injury that responsibility for the injury may not be reasonably attributed to the defendant"). "Foreseeability is the touchstone of this analysis" *Carson v. Dudley*, 25 A.D.3d 983, 984 (3d Dep't 2006) (citing *Kriz v. Schum*, 75 N.Y.2d 25, 34 (1989)).

Even if Plaintiff had succeeded in establishing that Defendant breached its duty and that alleged inadequacies at Slip 31 were the cause-in-fact of Salazar's injuries, the claims would fail at proximate cause. Plaintiff alleges that it was reasonably foreseeable that a dock line would remain attached, and that resulting tension would be placed on the cleat. Again, the Court credits that it is a known foreseeable risk that a mariner may forget to untie a dock or spring line from a cleat. But the Court does not credit that it is foreseeable that a mariner, having forgotten to untie a spring line from a cleat, will then rely on an individual cleat to sustain the shock load of a 28,000-pound boat accelerating freely for approximately 50 feet at a speed of approximately four knots. Austin agreed that the way Salazar departed the slip was not an accepted docking maneuver of any kind. Tr. 482:1-483:11. Rather, it was "an extreme event that . . . a mooring cleat is not intended to withstand." *Id.* at 582:21-583:14. This is also supported by Crivici's credible opinion that mariners rely on the operation of the holistic mooring system, not on any individual cleat. The

Court finds Austin's application of the progressive failure philosophy to the events of September 20, 2020, not credible. In other words, the Court finds that as Cleat B was not used for its intended purpose on September 20, 2020, it could not be relied upon to withstand the shock load that followed, and it was not foreseeable that it would be relied upon to withstand said shock load. As a result, the Court finds the events of September 20, 2020, were extraordinary, not foreseeable, and that Defendant is absolved from liability.

Accordingly, the Court concludes that Plaintiff has not established that Defendant breached the duties it owed to Plaintiff, nor that any of the alleged inadequacies at Slip 31 caused Salazar's injuries.

## CONCLUSION

For the foregoing reasons, the Court concludes that that Defendant is not liable to Plaintiff for the September 20, 2020 accident. The Clerk of the Court is respectfully directed to enter judgment in favor of Defendant Pat Malloy Waterfront LLC and close this case.

SO ORDERED.

*/s/*
ORELIA E. MERCHANT
United States District Judge

November 17, 2026
Brooklyn, New York